# Exhibit 2

STATE OF RHODE ISLAND                          SUPERIOR COURT
WASHINGTON, S.C.

---

UNETIXS VASCULAR, INC.,                    :
A Rhode Island corporation                 :
                          *Plaintiff,*     :
                                           :
        VS.                                :        C.A. No. WC - 2016 - 0425
                                           :
CORVASCULAR DIAGNOSTICS, LLC,              :
a Minnesota limited liability company      :
                          *Defendant.*     :
                                           :

---

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

Unetixs Vascular, Inc., by its undersigned counsel, files this Verified Complaint for Declaratory Judgment, Preliminary and Permanent Injunctive Relief and Damages:

### PARTIES AND JURISDICTION

1.      The Plaintiff, Unetixs Vascular, Inc. ("Unetixs" or "Plaintiff"), is a Rhode Island corporation with its principal place of business located at 125 Commerce Park Road in North Kingstown, Rhode Island 02852.

2.      The Defendant, CorVascular Diagnostics, LLC ("CorVascular" or "Defendant"), is a Minnesota limited liability company in the business of supplying healthcare products to medical facilities with a principal place of business located at 5557 Pioneer Creek Drive in Maple Plain, Minnesota 55359.

3.      This Court has jurisdiction over the subject matter of this lawsuit pursuant to R.I. Gen. Laws §§ 8-2-13 and/or 8-2-14.

1

4.     The Court has personal jurisdiction over the Defendant because the allegations contained herein satisfy R.I. Gen. Laws § 9-5-33 and the constitutional due process requirements of the Fourteenth Amendment.

5.     Venue is proper in this Court pursuant to R.I. Gen. Laws §§ 9-4-3 and/or 9-4-4.

### STATEMENT OF FACTS

6.     The Plaintiff is a domestic manufacturer and distributor of physiologic vascular instruments and designs, manufactures and distributes diagnostic vascular testing instruments.

*A.* ***The Unetixs-Viasonix Exclusive Distribution Agreement.***

7.     In April of 2016, the Plaintiff began negotiations with Viasonix, Ltd. ("Viasonix"), an Israeli company engaged in the development and sales of advanced vascular medical devices. The Plaintiff and Viasonix negotiated an exclusive distributorship agreement whereby the Plaintiff would exclusively distribute Viasonix's Falcon products in the United States (hereinafter "Distribution Agreement").

8.     The Distribution Agreement grants the Plaintiff the exclusive right to domestically distribute the Falcon/PRO, the Falcon/Quad and the Falcon/ABI+ (hereinafter "Viasonix Falcon Products") which are each vascular diagnostic products. These products are marketed to hospitals and medical clinics.

9.     On May 4, 2016, Viasonix transmitted a draft agreement and, on July 15, after minor revisions, Viasonix and the Plaintiff executed the Distribution Agreement (a partially redacted copy of the Distribution Agreement is attached hereto as Exhibit A). Pursuant to the Distribution Agreement, the Plaintiff is obligated to purchase a minimum number of Viasonix Falcon Products per year and, in exchange, receives the exclusive right to sell those products in the United States.

10.     Pursuant to Section 8.1 of the Distribution Agreement, the Plaintiff has made significant financial commitments to Viasonix including, without limitation, agreeing to purchase a certain number of Viasonix Falcon Products for demonstration purposes over the next six (6) months.

11.     Additionally, pursuant to Section 4.2 of the Distribution Agreement, the Plaintiff has committed to purchase a minimum number of Viasonix Falcon Products by the end of 2016 and an increasing minimum annual number for the life of the Distribution Agreement.

B.   *The Terminated Viasonix-CorVascular Distribution Agreement.*

12.     Prior to the execution of the Distribution Agreement, in December of 2013, Viasonix executed a distributorship agreement with the Defendant for similar Falcon products. (hereinafter "Terminated Viasonix-CorVascular Distribution Agreement" and attached hereto as Exhibit B).

13.     On page 3 of the Terminated Viasonix-CorVascular Distribution Agreement, there is a clause which provides as follows:

> **Payment for Products.** Payment conditions for purchase orders (Hereinafter PO) for the first order of demonstration systems will be 50% pre-payment and 50% 30 days after Products shipment received by [the Defendant] from Viasonix. All future PO payment conditions shall be 30 days after Product shipment received by [the Defendant]. Non-payment by [the Defendant] within the aforementioned period shall be considered a material breach of this agreement. [Hereinafter "Payment Clause"].

14.     The Terminated Viasonix-CorVascular Distribution Agreement further provided, on page 5 and in relevant part only, as follows:

> **Termination**. This Agreement may be terminated by either party upon the mutual agreement of the parties, or if either party breaches or defaults in the performance or observance of any of the material provisions of this Agreement, or in the event that either party shall become insolvent or shall suspend its business, or in the event of a business transaction such as change in control or ownership, or in the event of change in management, or in the event of violation by either party of

3

applicable domestic or international laws. . . . . [Hereinafter "Termination Clause"].

15.     Beginning in or around August of 2015, an internal dispute began within the Defendant's senior management team/ownership and culminated in February of 2016 when the Defendant's minority owner and senior member of the sales team resigned and another minority owner and senior member of the sales team was terminated from employment with the Defendant.

16.     Furthermore, on January 13, 2016, Viasonix transferred six Falcon products to the Defendant for $71,580 on thirty (30) day credit and five days later, on January 18, Viasonix transferred another five Falcon products to the Defendant for $59,710 on thirty (30) day credit.

17.     On February 22, with at least $131,290 due and payable, Viasonix's counsel transmitted correspondence to Defendant's counsel refuting certain allegations that had been previously levied by the Defendant and demanding immediate payment of all outstanding indebtedness. The letter concluded that the Defendant's failure to make immediate payment would result in termination of the agreement. (February 22 correspondence attached hereto as Exhibit C).

18.     On February 23, Defendant's counsel responded with a list of conditions upon which the relationship with Viasonix could continue, but with no indication that payment was forthcoming. The next day, Viasonix counsel responded that it was willing to discuss resolution of the situation but that the outstanding $131,290 had to be paid to Viasonix by February 26 or the agreement would be terminated. On February 25, Defendant's counsel responded that "Viasonix is not only not going to recover the $130,000, it is exposing itself to a $3M+ lawsuit." (This email exchange is attached hereto as Exhibit D).

4

19.     On March 7, Viasonix's counsel transmitted a letter to Defendant's counsel reiterating that Viasonix had officially terminated the distributorship agreement as of February 26 for lack of payment and requested that the Defendant remove any mention of Viasonix from its website among other demands. (March 7 termination letter attached hereto as Exhibit E).

20.     Following Viasonix's termination of the agreement with the Defendant, Viasonix began the aforementioned negotiations with the Plaintiff.

C.  *The Defendant's Cease-and-Desist Letters.*

21.     During the negotiations between Viasonix and the Plaintiff, the Defendant transmitted cease and desist letters to current and prospective customers wrongfully alerting them that the Defendant remained the sole and exclusive distributor of the Falcon and that those customers should decline to purchase Falcon products from any other entity.

22.     More specifically, the letters declared that CorVascular remains the exclusive distributor of the Falcon in the United States and intends to vigorously pursue any and all claims against any person or entity who sells, attempts to sell, refers or otherwise participates in the sale of the Falcon by or through any other person or entity other than CorVascular in the United States.

23.     These letters were specifically issued for the purpose of precluding the Plaintiff from distributing Viasonix Falcon Products in the United States.

24.     Indeed, on June 17, 2016, the Plaintiff received (in Rhode Island) a similar cease and desist letter from the Defendant wrongfully claiming that the Defendant remains the exclusive distributor of the Falcon in the United States and demanding that the Plaintiff cease any efforts to sell the Falcon in the United States. (June 17, 2016 cease and desist letter attached hereto as Exhibit F).

25.     The aforesaid acts and omissions by the Defendant against the Plaintiff and the Plaintiff's current and prospective customers were directed at the Plaintiff in the State of Rhode Island.

### COUNT I
### DECLARATORY JUDGMENT UNDER R.I. GEN. LAWS § 9-30-1, *ET SEQ.*

26.     The Plaintiff incorporates Paragraphs 1 through 25 as if fully alleged herein.

27.     The Distribution Agreement provides that the Plaintiff has the exclusive right to distribute Viasonix Falcon Products within the United States.

28.     The Plaintiff's intentional or negligent misrepresentations are unlawful and misstate the legal relationship between the Plaintiff, the Defendant and Viasonix.

29.     As a consequence of the foregoing, the Plaintiff seeks a decree declaring that the Plaintiff has the exclusive right to distribute Viasonix Falcon Products within the United States to the exclusion of the Defendant and that any attempts by the Defendant to so distribute or represent the authority to do the same are unlawful.

### COUNT II
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

30.     The Plaintiff incorporates Paragraphs 1 through 29 as if fully alleged herein.

31.     The Distribution Agreement between Viasonix and the Plaintiff constitutes a legitimate business interest and expectancy in exclusively distributing Viasonix Falcon Products in the United States.

32.     The Plaintiff has made financial commitments in excess of $100,000 in reliance upon the ability and authority to exclusively sell Viasonix Falcon Products in the United States.

33.     The Defendant has made intentional misrepresentations to potential customers regarding the Plaintiff's authority to exclusively sell Viasonix Falcon Products in the United

6

States which has significantly interfered with the value of the Plaintiff's legitimate business interest and expectancy.

34.     This conduct is reasonably likely to cause third parties to refuse to enter into the business relationships upon which the Distribution Agreement is predicated thereby preventing the Plaintiff from fully enjoying the benefits of the Distribution Agreement.

35.     The Defendant was aware of the Plaintiff's business interests and/or expectancies when it intentionally interfered therewith.

36.     The Defendant's wrongful actions have caused the Plaintiff extensive loss, costs and damages.

**COUNT III**
**INTENTIONAL/NEGLIGENT MISREPRESENTATION**

37.     The Plaintiff incorporates Paragraphs 1 through 36 as if fully alleged herein.

38.     The Defendant has made either intentional or negligent misrepresentations to third parties about its continuing relationship with Viasonix.

39.     These misrepresentations have caused harm to the Plaintiff in that they are likely to limit the Plaintiff's ability to exclusively sell Viasonix Falcon Products to third parties.

40.     The Plaintiff has made substantial financial commitments based upon its exclusive right to distribute Viasonix Falcon Products.

41.     The Defendant intended third parties to rely upon this misrepresentation to the financial detriment of the Plaintiff and third parties have so relied.

42.     The Defendant's intentional or negligent misrepresentations have caused damages to the Plaintiff.

<u>COUNT IV</u>
### <u>PRELIMINARY & PERMANENT INJUNCTION ENJOINING FURTHER INTERFERENCE WITH THE PLAINTIFF'S BUSINESS EXPECTANCIES</u>

43.     The Plaintiff incorporates Paragraphs 1 through 42 as if fully alleged herein.

44.     The Defendant has made numerous misrepresentations to third party prospective customers regarding its exclusive authority to sell Viasonix Falcon Products.

45.     Each misrepresentation causes the Plaintiff irreparable harm in that each is likely to permanently destroy the Plaintiff's ability to enter into agreements with the recipients of the misrepresentations.

46.     Additional customers may be lost should the Defendant be permitted to continue their misrepresentations regarding its exclusive authority to distribute Viasonix Falcon Products.

47.     The Plaintiff has a strong likelihood of success because the Distribution Agreement provides the Plaintiff with a legitimate business interest in exclusively distributing Viasonix Falcon Products and the Defendant's misrepresentations have knowingly and intentionally interfered with that interest.

48.     In view of the foregoing, the Defendant should be preliminarily and permanently enjoined and restrained from any further interference with the Plaintiff's legitimate business expectancies including but not limited to representing to third parties that Defendant has any right to distribute Viasonix Falcon products.

### **PRAYERS FOR RELIEF**

WHEREFORE, the Plaintiff prays that this Court enter an order, judgment and decree as follows:

(a) Declaring that the Plaintiff has the exclusive right to distribute Viasonix Falcon Products within the United States to the exclusion of the Defendant and that any attempts by the Defendant to so distribute or represent the authority to do the same are unlawful;

(b) Preliminarily and Permanently enjoin the Defendant from attempts to sell Viasonix Falcon Products or representing to third parties that it has any right to do the same;

(c) Actual Damages;

(d) Punitive Damages;

(e) Prejudgment interest pursuant to R.I. Gen. Laws § 9-21-10;

(f) Costs and attorneys' fees; and

(g) Such other and further relief as justice may require.

## JURY DEMAND

The Plaintiff hereby demands a jury trial on all issues so triable.

**PLAINTIFF**
UNETIXS VASCULAR, INC.

By its Attorneys,

*/s/ Stephen F. Del Sesto*
Stephen F. Del Sesto (#6336)
William M. Dolan III (#4524)
Nicholas L. Nybo (#9038)
Donoghue Barrett & Singal, PC
One Cedar Street, Suite 300
Providence, Rhode Island 02903
(401) 454-0400 Telephone
(401) 454-0404 Facsimile
sdelsesto@dbslawfirm.com
wdolan@dbslawfirm.com
nnybo@dbslawfirm.com

Dated: August 12, 2016

VERIFICATION

I, John J. Haefele, as a person with personal knowledge of the facts which form the basis of the above-captioned action, being duly sworn, hereby state under oath that I have read the foregoing Verified Complaint and can verify that the facts alleged forth therein are true and accurate to the best of my knowledge, expect those statements made upon information and belief, and as to such statements I believe them to be true.

John J. Haefele, Vice President & General Manager
Uneixs Vascular, Inc.
125 Commerce Park Road
North Kingstown, Rhode Island, 02852

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

Subscribed and sworn to before me this 5th day of August, 2016.

Notary Public
Print Name: Stephen DelSesto
My commission expires: 4/1/2018

10

EXHIBIT A

<u>DISTRIBUTION AGREEMENT</u>

This Distribution Agreement ("**Agreement**") is made and entered into as of the /5 day of July, 2016 (the "**Effective Date**") by and between Viasonis Ltd. of 10 Hamelacha St., Raanana, 4366105 Israel (the "**Company**") and Unetixs Vascular, Inc., a Rhode Island corporation, with its principal place of business at 125 Commerce Park Road, North Kingstown, Rhode Island, U.S.A ("**Unetixs**").

**WHEREAS**, the Company is engaged in the development and sales of advanced vascular medical devices, and

**WHEREAS**, the Company has requested that Unetixs serve as the exclusive distributor of certain of the Company's products in the United States of America and Unetixs has expressed a willingness to serve as the exclusive distributor of certain of the Company's products in the United States of America.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree, stipulate and declare as follows:

1.  **Preamble, Appendices, Headings**

    1.1   The Preamble and Appendices to this Agreement constitute an integral part hereof.

    1.2   The Headings in this Agreement are intended strictly for convenience and shall not be used to interpret or construe its provisions.

2.  **Definitions**

    In this Agreement, the following terms shall have the meaning ascribed to them below:

    2.1   "**Controls And Accessories**" as defined in **Annex A;**

    2.2   "**Products**" means all products of the Falcon product line of the Company, specifically the Falcon/Pro, Falcon/Quad, and Falcon/ABI+, as fully detailed in **Annex A**. The parties may, by mutual consent, add additional products of the Company to the list of the Products in which case **Annex A** shall be amended in writing by the Company and Unetixs. Such additional products may include products that do not belong to the Falcon product line;

    2.3   "**Sensors**" as defined in **Annex A;**

    2.4   "**Spare Parts**" means Sensors and/or Controls and Accessories;

    2.5   "**Term**" means the Initial Term and all Extended Terms;

    2.6   "**Territory**" means the United States of America.

3.  **Appointment**

    3.1   The Company hereby appoints Unetixs as an exclusive distributor of the Products in the Territory, under the terms and conditions provided herein, and Unetixs hereby accepts such appointment.

    3.2   Except as otherwise agreed by the parties in writing, Unetixs shall refrain from selling the Products in territories outside of the Territory.

4.  **Annual Purchase Targets**

    4.1   In the event that Unetixs shall fail to meet the Annual Target (as defined below) for a specific year, but only if such failure is not due to the circumstances detailed in Section 24.2 below, the Company shall have the right, at its sole discretion, to either (i) revoke the exclusivity granted to Unetixs in the Territory, or (ii) terminate this Agreement with a 60-day prior written notice to Unetixs.

4.2   For the purpose hereof, the "Annual Target" shall consist of orders of minimum quantities of Products during a certain calendar year as follows:

> For the year 2016:  ⬤⬤⬤ Falcon units;
>
> For the year 2017:  ⬤⬤⬤ Falcons units;
>
> For the year 2018:  ⬤⬤⬤ Falcons units;
>
> For the year 2019 and each year thereafter:  ⬤⬤⬤ Falcons units.

5.   **Unetixs' Obligations**

During the Term, Unetixs shall:

i) Unetixs shall use its best efforts to establish and develop Sales of the Products to customers in the Territory and related services in a manner consistent with the highest standards in the industry and develop and promote the goodwill and reputation of the Company;

ii) Maintain staff, adequate in all respects, as may be required to carry out its obligations under this Agreement. Unetixs shall establish and implement appropriate training programs for its staff in coordination with the Company;

iii) Maintain sufficient inventory to meet the immediate demand for the Products and Spare Parts in the Territory;

iv) Establish and maintain a sales support and service network, adequate to efficiently promote, sell, support, service and repair the Products in the Territory;

v) After the end of each calendar quarter, Unetixs shall provide the Company with a quarterly sales report that shall include a summary of Products sales, a description of Unetixs' marketing activities during the preceding quarter and market feedback. The report shall also include a non-binding forecast of expected sales of Products for the next quarter and for the next 12 months as well as the planned activities for the next quarter and the next 12 months.

vi) Forward to the Company, as soon as practicably possible and in a format to be agreed upon between the parties written notice of all complaints of any nature related to the Products of which Unetixs becomes directly aware;

vii) Maintaining all quality records for a period of at least five (5) years. Thereafter, Unetixs will either continue to retain the records, or return them to the Company. Quality records can include: traceability records of customer sales, incoming inspection records of Products from the Company, training certificate records of personnel, and customer complaints;

viii) Within three (3) days of Unetixs' receipt of written notice by the Company of any recall of Products, Unetixs will use commercially reasonable efforts to immediately notify all customers of the recall(s) including, providing customers with all of the relevant information known to Unetixs related to the recall;

6.   **Company's Obligations**

During the Term, the Company shall:

i) Provide Unetixs with prompt advice, assistance and support for the handling of queries and problems with regard to operation, support and service of the Products as and when requested by Unetixs or otherwise required;

ii) Provide Unetixs with updated technical information on the Products;

iii) Provide needed technical and sale support and provide special training to the personnel selected by Unetixs. Such training shall take place at a location to be

2

agreed upon by the parties in such manner and at such times as will be agreed
upon by the parties;

    iv)    Provide Unetixs, if applicable, with available sample Company brochures,
newsletters, flyers and other Company sales publications; and

    v)    Provide Unetixs, when necessary, with all the documents needed for importing
the Products into the Territory.

**7.    Purchase Orders and Delivery**

7.1    Unetixs shall submit to Company written purchase orders ("**Purchase Orders**") setting
forth the types of and quantities of ordered Products and/or Spare Parts (together, the "**Purchased
Items**"). All Purchase Orders are subject to acceptance by Company and are not binding on Company
unless or until confirmed in writing by Company ("**Order Confirmation**"). Each Order Confirmation
shall specify the expected date of delivery. The Company shall use its best efforts to deliver the
Products and/or Spare Parts on or before the expected date of delivery. In no event shall the Company
be responsible for a delay in delivery and/or for damages or losses attributable to any such delay.
Further Unetixs shall not be responsible for non-compliance with Sections 4 or 5 (ii) herein which is
due to and a result of any delay in delivery and/or for damages or losses attributable to any such delay.

7.2    Unetixs shall inspect the Purchased Items within fourteen (14) days after Unetixs' receipt
of delivery, and notify the Company within this fourteen (14) day time frame of any non-conformities
found in the Purchased Items. Failure to timely reject or give proper notice of rejection shall be
deemed to constitute acceptance of such Purchased Items.

7.3    The Company shall deliver the Purchased Items to Unetixs Ex-Works, Ra'anana, Israel.

7.4    Unetixs is solely responsible for payment of any taxes, import duties, customs, excise
fees, value added taxes, withholding taxes or any other taxes or fees associated with the importation
and sale of the Products in the Territory, or associated with the payments to the Company hereunder,
except income taxes of the Company. Unetixs shall pay such fees and taxes without deducting them
from any invoiced amount due to the Company.

**8.    Demo Systems**

8.1    Within thirty (30) days after the execution of this Agreement by both parties, Unetixs will
issue a Purchase Order for ▓▓▓▓ Falcon/Pro Products that Unetixs shall use as "demo systems" for
demonstration purposes only. Within six (6) months after the execution of this Agreement by both
parties, Unetixs will issue a Purchase Order for ▓▓▓▓ additional demo systems.

8.2    Thereafter, during the Term, Unetixs will at all times, maintain a number of demo
systems that will equal at least the number of sales persons employed by Unetixs who will be selling
Products within the Territory.

8.3    Demo systems will be priced at ▓▓▓▓ (US dollars) per unit, provided that
replacement demo systems to the demo systems that were sold by Unetixs to customers per
Section 8.4 below will be priced at the price set forth in **Annex A** attached hereto without any
discount.

8.4    Demo Systems may not be sold to customers by Unetixs without the prior permission of
Company; however, after one (1) year of demonstration use of any Demo System Unetixs may, at its
election, sell such Demo Systems to customers.

**9.    Title to the Purchased Items**

Title in and to any Purchased Items (excluding Intellectual Property related thereto), shall pass
to Unetixs only upon satisfaction in full of all payment therefore as set forth in Section 10
below.

10.    **Prices and Terms of Payment**

10.1    The initial purchase price of the Products and Spare Parts shall be as set forth in **Annex A** hereof (the "Price List").

10.2    The Price List may be amended from time to time by the Company for reasons solely due to changes in the cost of raw materials and/or costs of goods sold or exchange rates. In addition, the Price List may be updated by the Company at the end of every odd calendar year (starting at the end of 2017) during the Term, provided, however, that any price increase of more than ▆▆▆▆▆▆▆▆ shall require Unetixs' prior written approval. Upon any such update of the Price List, Annex A shall be updated accordingly. The parties agree that each shall act in good faith and shall abide by reasonable, industry appropriate standards and practices regarding any proposed updates to the Price List. It is understood that, as appropriate, updates to the Price List may increase or decrease prices set forth on the Price List.

10.3    Unetixs will pay the Company for Purchased Items within thirty (30) days from the date of delivery, for as long as Unetixs has not exceeded the Credit Limit as defined below. Unetixs acknowledges that open credit amount may vary from time to time and may not amount to more than a certain amount as shall be determined by the Company from time to time ("Credit Limit"), which is currently ▆▆▆▆▆▆▆▆ (US dollars). In the event that Unetixs desires to exceed the Credit Limit then the Company may, in its sole and absolute discretion, demand an advance payment for the entire amount exceeding the Credit Limit before delivery any Purchased Items.

10.4    If Unetixs fails to make any payment when due, then, without prejudice to Company's other rights and remedies herein, any amount due to the Company will bear interest at the rate of one percent (1%) per week from the due date until the outstanding sums are fully paid.

10.5    Any payments made by Unetixs hereunder shall be made without setoff, deduction or other withholding (including tax withholding, if applicable).

11.    **Discontinuation of Products**

In the event that the Company decides to discontinue the manufacture of any of the Products, the Company shall notify Unetixs in writing to that effect at least ninety (90) days prior to the effective date of cessation of such manufacture to allow Unetixs to place end of life Purchase Orders. Thereafter, the distribution rights granted to Unetixs herein in respect of such discontinued Product shall cease.

12.    **FDA**

In the event that the US Food and Drug Administration ("FDA") limits or prevents the sale of Products within the Territory for any reason, the Company shall, at its sole cost and expense, make all reasonable commercial efforts to comply with any request or demand of the FDA in order to remedy the situation. It is being understood that the Company shall not in any event be liable for any damage or loss that is caused to Unetixs and/or Unetixs customers as the result of such limits imposed by the FDA. Further Unetixs shall not be responsible for non-compliance with Sections 4 or 5.iii) herein which is due to and a result of any such limits or preventions imposed by the FDA.

13.  **Warranty**

13.1  Each Product sold hereunder shall be warranted by Company until the earlier of twenty-four (24) months from the date of delivery to customers by Unetixs provided proof of the date of installation of Products is provided to the Company or twenty-seven (27) months from the date of delivery by the Company. Warranty for Spare Parts will be for ninety (90) days from the date of delivery by the Company.

13.2  The Company will not provide warranty and will not be responsible for any components that were not purchased directly from the Company and which are used in conjunction with Products, such as computers, printers, isolation transformers or carts.

13.3  Warranty shall be void in the event that any Product is subject to misuse, accident, modification, unsuitable physical or operating environment, mechanical damage to Products or accessories, improper maintenance, operation and testing of Products not according to Company instructions, or damage caused by any product for which the Company does not provide warranty.

13.4  Company shall continue to honor the original and any extended warranty period (to the extent purchased from the Company), if any, after any termination of this Agreement in connection with Products sold by Unetixs prior to any termination for any reason under this Agreement.

13.5  UNLESS OTHERWISE EXPLICITLY PROVIDED FOR HEREIN, THE COMPANY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WITH REGARD TO ANY PRODUCT OR RELATED MATERIALS PROVIDED UNDER THIS AGREEMENT.

14.  **Maintenance and Service**

14.1  Unetixs will provide service and maintenance to all customers that purchased Products from Unetixs. In addition, Unetixs will provide service and maintenance to Products sold before the effective date of this Agreement by previous distributors of the Products in the Territory.

14.2  Unetixs will appoint dedicated service technicians who will be trained by personnel of the Company at Unetixs' offices, as shall be coordinated among the Company and Unetixs.

14.3  Service and maintenance of the Products will be performed in accordance with the guidelines set by the Company and all local regulatory requirements.

14.4  Unetixs will continue to provide service and maintenance after the termination of this Agreement in connection with Products sold by Unetixs before such termination, for the duration of the original warranty period provided by the Company.

14.5  For each service issue that requires the involvement of the Company, Unetixs shall be responsible to provide the Company with remote access to the serviced Products and computers to determine the nature of problems and try to provide an appropriate solution. If the problem cannot be solved through the remote access, the serviced Product will be shipped to the Company for repair. The Company will not cover any service related costs beyond the repair of the unit(s), other than Products shipment from Unetixs to the Company for repair during the warranty period and shipment of the repaired Products back from the Company to Unetixs. All other service related costs shall be borne by Unetixs.

14.6  UNLESS OTHERWISE EXPLICITLY PROVIDED FOR HEREIN, NOTHING HEREIN SHALL BE CONSTRUED OR INTERPRETED AS CREATING OR IMPOSING ANY OBLIGATION ON UNETIXS TO HONOR OR MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH REGARD TO ANY PRODUCT OR RELATED MATERIALS PROVIDED UNDER THIS AGREEMENT.

15.  **Intellectual Property**

8

430666.1

15.1   Unetixs acknowledges the Company's exclusive right, title and interest in any and all patents, copyrights, designs, trade names, trademarks, know-how and any other intellectual property rights, whether registered or not, in and to the Products (collectively, the "**Intellectual Property**"). Unetixs acknowledges that it has no rights, title or interest in and/or to the Intellectual Property.

15.2   Notwithstanding the above, the Company hereby grants Unetixs a royalty-free, limited license, during the term of this Agreement, to use the Company's trademarks, trade names and/or logo associated with the Products, solely for the purpose of promoting sales of the Products.

15.3   Unetixs will not alter, obscure or remove any trademarks, trade names, names or symbols or any markings, colors, logos or other insignia which are contained on or in or affixed to the Products by the Company.

15.4   Unetixs shall promptly notify the Company if it becomes directly aware of any infringement of the Intellectual Property by any third party and shall assist Company in any action deemed necessary by Company to protect such Intellectual Property.

16.   **Indemnity**

16.1   The Company shall indemnify Unetixs, its directors, officers and affiliated companies (each, an "**Indemnified Person**") and hold them harmless in respect of all liability and/or direct damages incurred by any Indemnified Person that result from any and all direct claims initiated against any Indemnified Person by or on behalf of Corvascular Diagnostics, LLC. ("**Corvascular**") that is related to any previous distribution agreement entered by and between the Company and Corvascular, subject, however, to the following conditions:

        i)    The Indemnified Person shall notify the Company in writing promptly of each such claim;

        ii)    The Company shall have the sole control of the defense and/or settlement of any such claim and shall bear the sole cost and expense for the defense or settlement of the same;

        iii)    The Indemnified Person shall cooperate fully with the Company as may be reasonable necessary or lawful, in the defense or settlement of the claim; and

        iv)    The Indemnified Person shall not admit to any such claim, agree to settle such claim, and/or make any payments with respect to such claim, without the Company's prior written consent.

        v)    The Indemnified Person shall have the right, but not the obligation, to participate in the defense of such claim with counsel of its choice at its sole cost and expense.

16.2   Excluding matters related to section 16.1 above, Unetixs will defend, indemnify and hold Company harmless against all liability and expenses arising from any claims brought by third parties against the Company which relate to the negligence, omission, misrepresentation or willful acts of Unetixs its employees, representatives and other agents, in connection with this Agreement.

17.   **Limitation of Liability**

17.1   The Company's liability to Unetixs under any or all provisions of this Agreement, or any transaction contemplated by this Agreement, shall be limited to the aggregate payments actually received by the Company from Unetixs under this Agreement.

17.2   IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR LOST PROFITS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR ARISING OUT OF OR IN CONNECTION WITH ITS AND/OR THE PRODUCTS PERFORMANCE OR FAILURE TO PERFORM PURSUANT TO THIS

6

AGREEMENT, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. DISTRIBUTOR RELEASES COMPANY FROM ALL OBLIGATIONS, LIABILITY, CLAIMS, OR DEMANDS IN EXCESS OF THE LIMITATIONS PROVIDED IN SECTION 17.1 ABOVE.

18.     **Right of First Refusal**

18.1    Until the earlier of: (i) the fourth (4ᵗʰ) anniversary of the Effective Date; or (ii) termination of this Agreement, the Company shall not execute any final agreement of Sale (as defined below) with any other third party, excluding Unetixs or an affiliate of Unetixs, unless an RFR Notice (as defined below) shall have first been provided by the Company to Unetixs and the Company shall have first complied with all of its obligation under this Section 18 (the "**Right of First Refusal**"). For the purpose hereof, the term "Sale" means (i) a sale or a grant or an exclusive license by the Company to all or substantially all of its assets and business to a third party; or (ii) the grant by the Company of exclusive distribution rights in connection with the Products in the Territory; or (iii) a sale by the Company of all or substantially all (50.1% or more) of the Company's assets and/or business to a third party.

18.2    In the event the Company receives a term sheet, letter of intent or other document setting forth terms of an initial offer of Sale ("**Offer**") from any party (the "**Proposing Party**"), then within fourteen (14) days following Company's receipt of the Offer or, if required by the Company's governance documents, the approval by the Company's Board of Directors of the proposed terms of any such Offer and of the entering by the Company into serious negotiations with the Proposing Party based on such proposed terms, the Company shall deliver to Unetixs written notice of such Offer (the "**RFR Notice**"), provided however that Unetixs shall simultaneously execute a customary Non-Disclosure Agreement with the Company in a form mutually agreed upon.

18.3    The RFR Notice shall include an executive summary of the Offer which shall be prepared by the Company and be provided to Unetixs with, in reasonable detail, all of the material terms of the contemplated Offer, including, without limitation, the amount and terms of the consideration to be received by the Company, and (to the extent contemplated in the Offer) conditions to closing and any other the material terms of the Offer, including the material terms of any related agreements to be entered into in connection therewith (the "**Executive Offer Summary**"), provided however, that in no event the Company shall be required to disclose to Unetixs the identity of the Proposing Party or certain other confidential proprietary information of the Proposing Party.

18.4    Following Unetixs receipt of the RFR Notice and continuing every thirty (30) days thereafter until Company and Proposing Party agree upon a finalized agreement of Sale, Company shall provide Unetixs with a monthly summary of negotiated changes to the material terms of the Offer. Once the Sale Agreement between Company and the Proposing Party is finalized but prior to execution, Company shall provide a complete copy (however, with Proposing Party name redacted) of the finalized Sale Agreement to Unetixs (the "**Final Sale Agreement**").

18.5    Within seven (7) days of Unetixs' receipt of the Final Sale Agreement (the "**Expiration Date**"), Unetixs shall be entitled, within its sole and exclusive discretion, to notify Company of Unetixs' election to exercise its Right of First Refusal. An exercise by Unetixs of its Right of First Refusal shall be effected by delivering to the Company, on or prior to the Expiration Date, written notice of such election (the "**RFR Exercise Notice**"), which notice shall include either: (i) Unetixs' acknowledgment that it agrees to the terms of the Final Sale Agreement; or (ii) an offer (the "**Unetixs Offer**") on terms in all material respects not less favorable from a financial point of view than those of the Final Sale Agreement. The determination of whether the terms of the Unetixs Offer are in all material respects not less favorable from a financial point of view as aforesaid shall be made by the Company Board, in good faith, based on the advice of financial and legal advisors, and such determination will be conclusive. The Company shall provide to Unetixs written notice of the Company Board's determination (the "**Board Determination Notice**") no later than seven (7) days from the date of delivery of the Unetixs Offer to the Company and Unetixs shall have no more than

7

seven (7) days thereafter to revise the Unetixs offer as may be necessary to make it not less favorable from a financial point of view.

18.6   In the event that Unetixs exercises its Right of First Refusal and the Company Board determines that the Unetixs Offer is not less favorable from a financial point of view as aforesaid or Unetixs acknowledgment that it agrees to the terms of the Final Sale Agreement, then (i) the Company will immediately cease all discussions with the Proposing Party; and (ii) the Company and Unetixs will either: (x) execute the Final Sale Agreement, or (y) negotiate in good faith and use reasonable best efforts to execute a definitive agreement based on the Unetixs Offer. If a definitive agreement between Unetixs and the Company is not executed within forty-five (45) days from the date of receipt by Unetixs of the Board Determination Notice, the Company shall be permitted to resume its previous discussions with the Proposing Party and to consummate a Sale with the Proposing Party without any restriction except the following:

a.   Company shall require the Proposing Party to execute a Non-Solicitation Agreement in a form agreeable to both parties which shall prohibit Proposing Party from recruiting or soliciting the employment of any independent contractor or employee, direct or indirect, of Company or Unetixs utilized for sales, manufacturing, repairs or any other purposes required for Unetixs to properly perform under this Agreement;

b.   Company shall provide the Proposing Party with an accurate copy of this Distribution Agreement, as may be amended by the parties hereto from time to time, and require, as part of the Sale transaction, the Proposing Party to expressly assume the terms of this Distribution Agreement.

c.   Company, prior to or on the date of closing with any Proposing Party, shall pay to Unetixs a Distribution Agreement transfer fee in an amount equal to fifteen percent (15%) of the gross purchase price to be paid pursuant to the Offer.

19.   **Additional Requirements upon exercise of Right of First Refusal**

In the event that Unetixs elects to exercise its rights pursuant to Section 18 of this Agreement, in connection with such exercise Unetixs agrees that, subject to Unetixs review of any then existing employment agreements, independent contractor agreements or other similar agreements or terms, after any necessary negotiations, as may be determined and required by Unetixs in its sole judgement, to employ Company's employees or engage Company's independent contractors, employed or engaged in connection with the Assets. This Section 19 shall apply in the event that Unetixs exercises its rights pursuant to Section 18 of this Agreement; and

20.   **Non-Solicitation by Company**

20.1   Company represents and warrants to Unetixs that if this Agreement is terminated due to Company's breach hereunder, for a period of no less than one and one-half years (1 ½) Company shall not take any action, directly or indirectly, or direct any affiliate, subsidiary, agent, representative, successor, assign, nominee, employee, officer, director or other third party to recruit or solicit the employment of any independent contractor or employee, direct or indirect, of Unetixs, including, without limitation those utilized for sales, manufacturing, repairs or any other purposes required for performance under this Agreement;

20.2   The terms of Section 20.1 above shall not apply and be of no force or effect if this Agreement is terminated without fault on the part of the Company (e.g. termination pursuant to Section 4 hereof if Unetixs fails to meet an Annual Target)

8

430886.1

21    Confidentiality

21.1   The parties acknowledge that confidential information may be exchanged during the course of transactions under this Agreement. For purposes hereof, "**Confidential Information**" shall mean all information, formulations, data, technology, know-how, designs, inventions, discoveries, processes, models and/or trade and business secrets, including without limitation the details of this Agreement, sales, financial, contractual and marketing information which have been hereto or may hereafter be transmitted or otherwise disclosed by the parties hereto.

21.2   Except as may be necessary for Unetixs to properly perform under this Agreement, the parties shall maintain in the strictest confidence all Confidential Information received by or from the other party hereto. Neither party shall divulge any Confidential Information to any person or entity without the prior express written consent of the other party, except that the parties may afford their employees, who are bound by similar confidentiality provisions, access to the Confidential Information to the extent required by them for the proper performance of their duties under this Agreement.

21.3   The Confidential Information shall not include any information which (a) is in or enters the public domain other than by a breach hereof; (b) was known to the recipient prior to the disclosure, as evidenced to the disclosing party by tangible evidence; (c) is legally transmitted or disclosed by a third party which owes no obligation of confidentiality to either party; or (d) was disclosed by operation of law, subject to (i) the receiving party providing written notice to the disclosing party so as to allow sufficient opportunity to seek protective or other court orders and (ii) the receiving party cooperating with the disclosing party, at the disclosing party's expense, to prevent or limit the disclosure.

21.4   Except as may be necessary for Unetixs to properly perform under this Agreement, the disclosure of Confidential Information or its use hereunder shall not be construed in any manner to grant either party any right or license with respect to Confidential Information other than the right to use the Confidential Information strictly in accordance with the terms and conditions of this Agreement.

21.5   Without derogating from the above and except as may be necessary for Unetixs to properly perform under this Agreement, Unetixs agrees that it will not, at any time, directly or indirectly, use or assist others in using any part of Company's Confidential Information to design and/or manufacture and/or publish any product which is the same as or similar to the Product.

22.    Term and Termination

22.1   This Agreement shall be effective as of the Effective Date and shall remain in effect until December 31, 2021 (the "Initial Term"), and shall automatically be renewed for extended periods of 12 months each (an "Extended Term") at the end of the Initial Term and each Extended Term, subject to earlier termination pursuant to Section 4.1 above and this Section 22.22 unless either Party provides the other with written termination notice, no later than three (3) months prior to the end of the Initial Term or the respective Extended Term.

22.2   This Agreement may be terminated by either Party immediately in the event that the other party:

    i)     Breaches a material provision of this Agreement and such breach is not corrected within fifteen (15) days after receipt of written notice specifying the breach; or

    ii)    Breaches a non-material provision of this Agreement and such breach is not corrected within forty-five (45) days after receipt of written notice specifying the breach; or

    iii)   Becomes insolvent, or upon the filing by or against such other party of a petition in bankruptcy or reorganization or the appointment of a liquidator or receiver and if such petition is not discharged nor such liquidator or receiver

6

withdrawn within thirty (30) days, or upon assignment for the benefit of creditors of such party, or such similar action; or

iv)     carries out a Change of Control. For the purposes herein, a "**Change of Control**" means any direct or indirect change of fifty percent (50%) or more of the relevant Party's shares and equity interests.

22.3   In addition, this Agreement may be terminated by Company:

i)     Immediately, in the event that Unetixs assigns this Agreement in contravention of section 23 below; or

ii)     Immediately, in the event that Unetixs breaches its obligations under section Sections 15 (Intellectual Property) or 0 (Confidentiality).

22.4   In addition, this Agreement may be terminated by Unetixs:

i)     Immediately, in the event that Company takes any action that could reasonably be construed or interpreted to limit, restrict, remove, void or otherwise adversely impact any of the rights granted to Unetixs under this Agreement, including, without limitation, the exclusive distribution rights for the Products in the Territory granted to Unetixs under this Agreement; or

ii)     Immediately, in the event that Company or Unetixs is restrained or enjoined by any court of competent jurisdiction from performing under or continuing performance under any provision of this Agreement.

22.5   The following provisions shall apply upon termination or expiration of this Agreement for any reason other than any uncured breach of any provision under this Agreement:

i)     Unetixs shall cease all sales, service and other activities on behalf of Company shall return to Company or destroy and certify at Company's request, all Confidential Information previously furnished by Company and still in its possession as well as all Marketing Materials in its possession.

ii)     Unetixs shall cease from making any further use of Company's intellectual property rights and shall cease from trading under the "Company" name or use any of the Marks.

iii)     Unetixs shall have no right or claim against Company, including any claim to any goodwill associated with the Products and the Intellectual Property rights therein.

iv)     The termination or expiration of this Agreement shall in no way relieve either party from its obligations to pay the other any sums accrued hereunder prior to such termination or expiration.

v)     Unetixs shall take such action as is necessary to terminate its registration as distributor with any governmental authority.

vi)     Company shall have the right to buy from Unetixs the Products the latter has in stock at the date of termination of this contract, at the price originally paid by Unetixs. In the event that the Products that the distributor has in stock are not currently sold by Company or are not in new condition and in original packaging, Company shall have the right to buy the Products at half the price originally paid by Unetixs. This provision shall not impose any obligation on Company to purchase the stock.

vii)     Sections 15 (Intellectual Property), 16 (Limitation of Liability), 19 (Confidentiality), 22.5 (Termination Consequences) and 24 (General Provisions) shall survive termination or expiration of this Agreement.

10

23.   Assignment

This Agreement and the respective rights, benefits and obligations embodied herein shall not be assignable by Unetixs without the prior written consent of the Company, which may be granted or withheld at its sole and absolute discretion. Any purported assignment in contravention of this section shall be of no force or effect.

24.   General Provisions

24.1   This Agreement shall be governed by, interpreted and construed only in accordance with the laws of the State of Israel, without giving effect to its conflict of law principles. The competent courts in the Tel Aviv - Jaffa district, Israel shall have sole and exclusive jurisdiction regarding any dispute or claim arising hereunder or otherwise between the Company and Unetixs. Notwithstanding the aforementioned, the Company shall be entitled to instigate proceedings against Unetixs anywhere in the Territory or place of alleged infringement of this Agreement.

24.2   Neither party shall be liable to the other for its failure to perform any of its obligations hereunder during any period in which such performance is delayed by circumstances beyond its reasonable control including but not limited to fire, flood, war, embargo, strike, riot, inability to secure materials and transportation facilities, or the intervention of any governmental authority.

24.3   Any provision hereof which is found to be invalid, illegal or unenforceable under any applicable provision of law, shall be amended to the extent required to render it valid, legal and enforceable under such laws (or deleted if no such amendment is feasible), and such amendment or deletion shall not affect the enforceability of the other provisions hereof.

24.4   This Agreement represents the entire agreement between the parties on the subject-matter hereof and supersedes all prior discussions, agreements and understandings of every kind and nature between them. No modification of this Agreement will be effective unless in writing, signed by both parties.

24.5   The parties agree that failure of either party at any time to require performance by the other party of any of the provisions herein shall not operate as a waiver of the right of that party to request strict performance of the same or like provisions, or any other provisions hereof, at a later time.

24.6   Each of the parties hereto agrees that it shall first obtain the written approval of the other party for any news releases and advertisements it intends to issue to the Territory concerning the Products.

24.7   Any notice required or permitted to be given under the Agreement shall be sufficient if is in writing and sent by facsimile, by e-mail or by air-mail to the relevant party's address, e-mail address or facsimile number as set forth below, until otherwise directed by notice as aforesaid:

It is hereby agreed that:

    i)    Notices sent by air-mail shall be deemed to have been received seven (7) days after registration of the mailed notice.

    ii)    Notices sent by facsimile and e-mail shall be deemed to have been received twenty-four (24) hours subsequent to their transmission provided that written evidence of transmission may be produced.

    iii)    All notice periods hereunder shall be deemed to commence from the date the notice has been received, under this Section 24.7, by the notified party.

In witness whereof, the parties have signed this Agreement on and it shall effective as of date first written above:

430886.1                                    11

Vinsonix Ltd.

By: Dan Marsik, CEO

Unetixs Vascular, Inc.

By: _____

## ANNEX A

### Products, Accessories and Transfer Price

|  |  | PRICE (in US$) |
|---|---|---|
| PRODUCTS | Falcon/PRO (Note 1) | |
|  | Falcon/Quad (Note 2) | |
|  | Falcon/ABI (Note 3) | |
| SENSORS | 4 MHz CW Probe | |
|  | 8 MHz CW Probe | |
|  | 10 MHz CW Probe | |
|  | PPG sensor (finger clip) | |
|  | PPG sensor (Disk) | |
|  | Pressure Cuff | |
|  | Temperature sensor | |
| CONTROLS and ACCESSORIES | Remote Control | |
|  | Foot Switch | |
|  | Service Kit | |
|  | Roll of 1000 adhesive stickers | |

* Price for the Falcon/Pro will be subject to decrease as follows:

- If (a) Unetixs reaches 50% of the Annual Target in a specific year; and (b) at least 70% of the units ordered are Falcon/Pro units – then any additional units of Falcon/Pro ordered during such specific year shall be priced at

- If (a) Unetixs reaches 100% of the Annual Target in a specific year, and (b) at least 70% of the units ordered are Falcon/Pro units – then any additional unit of Falcon/Pro ordered during such specific year shall be priced at

430886.1

Note 1:  Falcon/*PRO* price package includes:

2 hand-held probes, 5 Fingerclip PPG sensors, 2 Disk PPG sensor, 1 air-hose assembly, 1 remote control.

Note 2:  Falcon/*Quad* price package includes:

2 hand-held probes, 4 Fingerclip PPG sensors, 2 Disk PPG sensor, 1 air-hose assembly, 1 remote control.

Note 3:  Falcon/*4Bt* price package includes:

4 Fingerclip PPG sensors, 2 Disk PPG sensor, 1 air-hose assembly, 1 remote control.

**Important:** Carts, isolation transformers, computers, printers, pressure cuffs and other computer accessories will be purchased by Unetixs from third parties independently.

EXHIBIT B

# DISTRIBUTION AGREEMENT

Between *Viasonix Ltd.* and *CorVascular Diagnostics, LLC*

Effective Date: **December 1, 2013**

This distribution agreement is between Viasonix Ltd. (Hereinafter Viasonix), a manufacturer of the Falcon product line (Hereinafter Products) operating out of Israel, and CorVascular Diagnostics, LLC, (Hereinafter CVDx) a US based medical device distributor which is managed and directed by Mr. Spencer Lien, with its business including the marketing, sales and service of peripheral vascular systems, with a main office located at 5557 Pioneer Creek Drive, Maple Plain, Minnesota 55359 USA.

Viasonix desires to appoint CVDx as Viasonix's exclusive distributor of its Products in the United States of America (USA) (Hereinafter Territory); and CVDx is willing to be the exclusive distributor of Products in the Territory.

The parties agree as follows:

**Appointment.** Viasonix hereby appoints CVDx, and CVDx hereby accepts such appointment, as the sole and exclusive distributor of Products within, and only within, the Territory. CVDx shall have the right to solicit and accept orders from, and invoice, ship, and deliver Products to purchasers located within, and only within the Territory. CVDx does not have the right to sell Products outside of the Territory. In the event that CVDx has an opportunity to sell Products outside of the Territory, and in the event that Viasonix does not have an exclusive distributor in the new location which is outside the Territory, then CVDx may request a written permission from Viasonix to temporarily sell in the new location until Viasonix appoints an exclusive distributor for that region. All decisions concerning marketing and sales of Products within the Territory, shall be subject to the sole discretion of CVDx; provided, however, that CVDx shall market Products consistent with the labeling approved by Viasonix and the FDA, including all warnings.

**Limited License.** Viasonix hereby grants CVDx a royalty-free limited license during the term of this Agreement and for so long as CVDx has rights to sell and service Products to use Viasonix trademarks, trade name or logo associated with the Products in connection with the advertisement, promotion and sale of the Products.

**Transfer Prices.** The distributor transfer list price of the Products is set forth in Appendix A of this Agreement. The transfer prices included in Appendix A shall remain in effect for a period of 12 months starting at the Effective Date. Thereafter, Viasonix may modify the transfer prices every 12 months in consideration of changes in the cost of goods sold, exchange rates, or market situation provided Viasonix provides CVDx notification of any transfer price increase no later than ninety (90) days prior to the effective date of the price

increase. Transfer Prices are Ex Works Viasonix office, Ra'anana, Israel (INCOTERMS 2000).

**Special Discount for Falcon/Quad**. Further the price conditions set forth above, Viasonix will provide a special discount for every Falcon/Quad system that CVDx sells (Hereinafter Special Quad Discount), provided that the total selling price of the Falcon/Quad (including peripherals, such as computers and computer accessories) by CVDx to the customer is under 19,500 US Dollars, and that CVDx will provide a copy of the customer's invoice to Viasonix as proof of the selling price. The total Special Quad Discount that Viasonix will provide in those cases is 1,050 US Dollars per each Falcon/Quad system purchased from Viasonix, provided that CVDx or related parties do not sell the optional carts separately to the customer.

**Special Discount for Falcon/Pro**. Further the price conditions set forth above, Viasonix will also provide to CVDx special discounts only for Falcon/Pro systems as follows: a) Starting with the 21ˢᵗ Falcon/Pro system that is purchased by CVDx from Viasonix during 2014, Viasonix will provide an 800 US Dollars special discount off the Falcon/Pro transfer price. b) Starting with the 41ˢᵗ Falcon/Pro system that is purchased by CVDx from Viasonix during 2015 and during each calendar year thereafter, Viasonix will provide an 800 US Dollars special discount off the Falcon/Pro transfer price. c) Viasonix will provide a total maximal discount of 1500 US Dollars for each Falcon/Pro system that is purchased by CVDx from Viasonix after the Minimum Sales Requirements as defined below are met during that calendar year.

**Demonstration Systems**. CVDx will purchase demonstration Products for each of its sales representatives in the Territory. Immediately upon signing this Agreement, CVDx will purchase a minimum of 2 Falcon/Pro demonstration systems. For these demonstration systems, Viasonix will provide a 25% discount off the distributor transfer prices provided in Appendix A. CVDx will further purchase a minimum of 3 additional Falcon/Pro demonstration systems by the end of March 2014, and will purchase additional Falcon/Pro demonstration systems thereafter for each of its sales representatives so that the total number of demonstration systems by the end of 2014 will be a minimum of 8 systems. Viasonix will provide also to these additional systems a 25% discount off the distributor transfer prices provided in Appendix A.

**Minimum Sales Requirement**. In order to maintain the exclusive nature of the appointment granted in this agreement in the Territory, CVDx will purchase in addition to the Demonstration Systems also at least 10 Products by the end of June, 2014, and a total of at least 45 Products by the end of 2014. CVDx will further purchase at least 90 additional Products during each calendar year thereafter. In the event that CVDx fails to meet the minimum purchase requirement of Products as set for each period, Viasonix shall have the right, at its sole discretion, to convert the exclusive appointment of this Agreement to a non-exclusive appointment or to terminate the Agreement upon 90 calendar days prior notice to CVDx. In the event Viasonix elects to terminate the Agreement, CVDx will have the right to fulfill pending sales orders for Products for a period no longer than 6 months after the effective date of termination, provided that new customers will not be approached by CVDx following the termination notice.

**Existing Sales.** All pending Products sales in the Territory that were initiated by the previous Viasonix distributor in the Territory and that are completed prior to the end of March, 2014 will belong to the previous Viasonix distributor.

**Payment for Products.** Payment conditions for purchase orders (Hereinafter PO) for the first order of demonstration systems will be 50% pre-payment and 50% 30 days after Products shipment received by CVDx from Viasonix. All future POs payment conditions shall be 30 days after Products shipment received by CVDx. Non-payment by CVDx within the aforementioned period shall be considered a material breach of this agreement.

**Sales Report.** CVDx shall provide Viasonix with a quarterly sales report that shall contain a non-binding forecast of expected sales of Products for the next quarter and for the next 12 months. In addition, the report shall include a summary of Products sales in the quarter that ended, and a description of CVDx's marketing activities during the quarter that ended, as well as planned activities for the next quarter and the next 12 months. The report will include also market feedback.

**Shipment of Products.** Viasonix shall ship Products and accessories to CVDx by air Ex Works Ra'anana, freight and insurance paid by CVDx. Customs, VAT, or any other importation costs and delivery of the Products to CVDx' end-user customers shall be the responsibility of CVDx. If any shipping date is specified, such date represents a good faith estimate by Viasonix, and in no event shall Viasonix be responsible for a delay in shipment or for damages or losses attributable to any such delay. CVDx shall inspect the Products shipment within 14 days after receipt, and notify Viasonix within this 14 day time frame of any non-conformities found in the shipment. Failure to timely reject or give proper notice of rejection shall be deemed to constitute acceptance of such shipment. In the event that the date of shipment from Viasonix of PO received from CVDx is more then 6 weeks after the shipment date originally confirmed in writing by Viasonix after receiving the PO, and in the event that CVDx is held accountable for the late delivery and is required to pay a penalty to the customer, then Viasonix will participate in the penalty fee up to a limit of the transfer price actually received by Viasonix for the penalized Products that was delivered late.

**Deletion of Products.** Viasonix shall have the right to delete Falcon models from this agreement in the event that Viasonix decides to stop distribution of this product, provided Viasonix provides CVDx notification no later than ninety (90) days prior to the effective date of the deletion.

**Intellectual Property.** No rights are granted hereunder to CVDx under any patents, trademarks or copyrights owned or controlled by Viasonix except as are incidental only to the sale of Products by CVDx and the right to use such products by CVDx customers.

**Promotion and sales of competing Products.** CVDx and its sales force shall not promote or engage in any sales or marketing activity with any competing product that is designed for similar measurements, specifications or applications as the Products without the prior written approval from Viasonix. Any violation of this section shall be considered a material breach of this agreement.

**Distributor duties**. CVDx represents and warrants that it will use reasonable commercial efforts to market Products in the Territory, which at a minimum shall be sufficient to enable it to meet its minimum sales requirements, such as participation in relevant trade shows, and customer support and training.

**Sales Force**. CVDx shall maintain adequate experienced sales personnel reasonably necessary to carry out the obligations of CVDx under this Agreement, that will effectively cover all of the Territory. By the end of March, 2014 CVDx sales force for the Products will include at least 3 professional vascular sales representatives, by the end of 2014 the total number of professional CVDx vascular sales representatives for the Products will be at least 8 professionals covering effectively all of the Territory. Any violation of this section shall be considered a material breach of this agreement.

**Maintenance of Inventory**. At all times during the term of this Agreement, CVDx shall maintain adequate inventory of Products, accessories and spare parts to serve immediate market and service needs.

**Service Responsibility**. CVDx agrees to appoint technicians that will receive service training from Viasonix. CVDx will be responsible to provide service to all Products sold by CVDx. Service to Products will be according to the guidelines set by Viasonix and local regulatory requirements. Items that were not purchased from Viasonix, such as computers, printers or carts are the sole responsibility of CVDx. CVDx will continue to provide service to the Products sold by it also after the termination of this Agreement for the duration of the original warranty provided by Viasonix. If CVDx sells or provides to customers an extended warranty for the Products beyond the duration provided by Viasonix, then CVDx will be responsible to transfer such extended warranty to a third party or to continue and provide the extended service warranty to these customers. For each service issue that requires the involvement of Viasonix, Viasonix will be provided with remote access to the serviced Products and computers to determine the nature of problems and try to provide an appropriate solution. Only if the remote access does not help in solving the problems, the serviced Products will then be shipped to Viasonix for repair. Viasonix will not cover any service related costs, other then Products shipment from CVDx to Viasonix for repair during the warranty period and the shipment of the repaired Products back from Viasonix to CVDx. All other service related costs shall be borne by CVDx.

**Service to Products already in the Territory**. CVDx will assume also full responsibility to provide service to Products that were sold in the Territory by previous distributors. CVDx will be responsible to contact all sites that purchased Products from previous distributors and notify them that CVDx is now their contact for any service issues.

**Record Keeping**. CVDx will be responsible for retaining all quality records for a period of at least 5 years. After that period CVDx will either continue to retain the records, or return the records to Viasonix. If the product lifetime changes, Viasonix will notify CVDx accordingly and CVDx will keep the records according to the new duration. Quality records can include: traceability records of customer sales, incoming inspection records of Products from Viasonix, training/certificate records of personnel, and customer complaints.

**Changes**. CVDx will not make any changes to the products, labeling or packaging received from Viasonix, unless a written approval is provided by Viasonix.

**Customer Complaints**. CVDx will notify Viasonix immediately (within 5 business days) of any customer complaints, including the relevant complaint information.

**Recalls**. CVDx will notify all customers immediately, within 3 days, whenever a recall of Products is made by Viasonix, providing them with all of the relevant information.

**Translations**. All translations from English that are used in conjunction with Products (including user manual and Falcon software) will be approved by Viasonix prior to use.

**Products Warranty**. The warranty period for the Products that were directly purchased by CVDx from Viasonix will be lesser of 24 months from the date of delivery to customers by CVDx provided proof of the date of installation of Products is provided to Viasonix, or 27 months from the date of shipment from Viasonix. Warranty for accessories, including probes, sensors and tubing will be for 90 days from the date of shipment from Viasonix. Viasonix will not be liable to any components that were not purchased directly from Viasonix that are used in conjunction with Falcon Products, such as computers, printers, isolation transformers or carts. Under the terms of the warranty, with any Products problem that CVDx cannot service, CVDx will notify Viasonix and Viasonix will instruct CVDx how to proceed. Viasonix will be provided in these cases with remote access to Products. Whenever Products need to be returned to Viasonix for service, it is the responsibility of CVDx to provide alternative solutions to the customers until a solution is provided. Shipment costs to Viasonix and back will be borne by Viasonix only during the warranty period. Misuse, accident, modification, unsuitable physical or operating environment, mechanical damage to products or accessories, improper maintenance, or damage caused by a product for which Viasonix is not responsible will void the warranty. Viasonix shall not be liable under any circumstances for damages of any kind, whether direct, consequential, financial or otherwise relating to the performance of Products, or service issues with Products, including damages or lost of business profits. In no event shall Viasonix's liability pursuant to this agreement exceed the transfer price for the Product purchased hereunder.

**Termination**. This Agreement may be terminated by either party upon the mutual agreement of the parties, or if either party breaches or defaults in the performance or observance of any of the material provisions of this Agreement, or in the event that either party shall become insolvent or shall suspend its business, or in the event of a business transaction such as change of control or ownership, or in the event of change in management, or in the event of violation by either party of applicable domestic or international laws. In the event that CVDX meets all of the requirements of this Agreement, and in the event that during the first 3 years of this Agreement Viasonix elects to terminate this Agreement due to a business transaction with a third party, and in the event that the third party decides not to continue to work with CVDX, then Viasonix will pay compensation to CVDX. A Sales Parameter (Hereinafter SP) will be calculated as follows: SP equals (X times 12) divided by Y, where X is the total in US Dollars of the purchases by CVDX from Viasonix until the date of the termination notice of this Agreement, and Y is the duration of the Agreement in full calendar months until the date of the notice of Agreement termination. The total compensation to CVDX will be calculated as the lower of: a) SP or b) 4 percent of the money Viasonix actually receives from the third party at closing of the business transaction or c) 250,000 US Dollars. Viasonix shall provide CVDx advance notice of Viasonix's reaching an agreement in the form of a Letter of Intent from a third party for a business transaction and upon receipt of said advance notice, CVDx shall no longer be obligated to comply with the Duty Not to Compete section of this Agreement. All information contained within said advance notice shall be kept confidential by CVDx.

**CVDx Representations.** CVDx represents and warrants that its activities in connection with the storage, distribution, marketing, installation, service, and sale of Products shall be conducted in accordance with applicable laws, rules and regulations in the Territory; that it shall not take any action which would, or fail to take any action where such failure would, directly or indirectly, result in a violation by CVDx or Viasonix of any applicable law or regulation, including without limitation, laws and regulations relating to the export, resale, and distribution of Product; that any promotional activities conducted in connection with the sale and marketing of Products shall be in accordance with the approved labeling of each Product; and that there are no outstanding obligations or agreements either written, oral or implied, inconsistent with this Agreement. Any violation of this section shall be considered a material breach of this agreement.

**Viasonix Representations.** Viasonix represents and warrants all Products supplied to CVDx shall be manufactured in accordance with the approved regulatory specifications for each such Products; and that all Products supplied to CVDx shall be packaged, stored, and shipped in conformity with standard requirements.

**Confidential Information.** CVDx and its sales representatives shall maintain in confidence all information provided to it directly or indirectly by Viasonix, including, but not limited to, information relating to the Products as well as licenses, patents, technology, software, or processes and business plans. CVDx shall use its best efforts to ensure that its officers, employees, sales representatives and other third parties do not disclose or make any unauthorized use of such Confidential Information.

**Duty Not to Compete.** CVDx its officers, agents, servants, sales representatives or employees shall not, at any time during the term of this Agreement, directly or indirectly be employed by, or become associated in any capacity with any person, firm or corporation competing with or setting up to compete with Viasonix in the manufacture or sales of goods similar to the Products distributed hereunder such as goods with equivalent technology and application, nor shall CVDx, its officers, agents, servants, sales representatives or employees compete with Viasonix in the manufacture or sales of similar goods without the prior written approval of Viasonix.

**Force Majeure.** Neither of the Parties to this Agreement shall be liable to the other Party for any loss, injury, delay, damage, or other casualty suffered or incurred by such other Party due to strikes, lockouts, accidents, fire, embargoes, explosions, floods, wars, governmental action, or any other cause similar thereto which is beyond the reasonable control of such other Party

**Governing Law.** This Agreement shall be construed and governed by the laws of Israel and any action relating to the enforcement or construction of this Agreement shall be within the exclusive jurisdiction of the courts of Israel, and each of the Parties agrees to submit to the personal jurisdiction of such courts in any such action.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first written above (the Effective Date).

CORVASCULAR DIAGNOSTICS, LLC          VIASONIX LTD.

By: Spencer Lien

Title: Managing Director

Signature: _____

Date: _November 25, 2013_

By: Dan Manor

Title: President and CEO

Signature: _____

Date: _____

## APPENDIX A
### PRODUCTS, ACCESSORIES AND TRANSFER PRICES

|  |  | Transfer PRICE (USD) |
|---|---|---|
| PRODUCTS | *Falcon/PRO* (Note 1) | 12,500 |
|  | *Falcon/Quad* ( Note 2) | 9,050 |
|  | *Falcon/ABI+* ( Note 3) | 6,700 |
| SENSORS | *4 MHz CW Probe* | 380 |
|  | *8 MHz CW Probe* | 380 |
|  | *10 MHz CW Probe* | 550 |
|  | *PPG sensor (finger clip)* | 195 |
|  | *PPG sensor (Disk)* | 195 |
|  | *Pressure Cuff* | 45 |
|  | *Temperature sensor* | 250 |
| CONTROLS and ACCESSORIES | *Remote Control* | 350 |
|  | *Foot Switch* | 300 |
|  | *Service Kit* | 2750 |
|  | *Roll of 1000 adhesive stickers* | 480 |

All prices are given in US Dollars ($).  All Prices are Ex Works Ra'anana, Israel.

Note 1: *Falcon/PRO* price package includes:

2 Doppler probes, 4 PPG Fingerclip sensors, 2 PPG Disc sensor, 1 air hose assembly, 1 remote control.

Note 2: *Falcon/Quad* price package includes:

2 Doppler probes, 2 PPG Fingerclip sensors, 2 PPG Disc sensor, 1 air hose assembly, 1 remote control.

In the event that the Special Discount to Falcon/Quad as detailed in the Agreement is applied, then the Falcon/Quad will include only 1 Doppler probe.

Note 3: *Falcon/ABI+* price package includes:

4 PPG Fingerclip sensors, 1 PPG Disc sensor, 1 air hose assembly, 1 remote control.

\* Carts, foot switch, computers, isolation transformers, cuffs and printers will be purchased directly by distributor.

EXHIBIT C



**Kadouch & Co. Law Offices**

Emmanuel Kadouch | Avrumi Monderer
Inbar Gorelick | Eado Hofstetter
Taly Gudovich

February 22, 2016

Mr. Timothy W. Fafinski, Esq
3411 Brei Kessel Road, Independence
<u>MN 55359, USA</u>

RE:   <u>Letters dated February 12, 2016 and February 18, 2016</u>

Dear Mr. Fafinski:

I have reviewed the Distribution Agreement dated December 1, 2013 (the "Agreement") and numerous correspondences between our respective clients over the past months. I also discussed extensively with Messrs. Dan Manor and Eli Levi from Viasonix Ltd. ("Viasonix").

I must say that I have come to the unequivocal conclusion that the allegations and claims expressed in your above referenced letters against both Viasonix and Mr. Dan Manor are totally unfounded and groundless. Moreover, the vast majority of the purported facts and the assumptions in both your letters are simply not true.

There are two possible explanations to your letters. The first is a severe misunderstanding by your client, Mr. Spencer Lien. The second is an attempt by your client to gain points in its disputes and claims with its former partners by trying to build a case against Viasonix and Mr. Manor in bad faith.

Since Viasonix became aware of the disputes among Mr. Lien and the sales representatives of CorVascular Diagnostics, LLC ("CorVascular"), Viasonix has acted in good faith to protect its legitimate commercial interests without becoming a party to such dispute, despite several attempts of all parties to involve Viasonix. Mr. Lien himself asked Mr. Manor in several occasions to try to mediate between the opposing parties.

I do not intend to address each and every claim and allegation in your letters. I do intend however to clarify the following:

(i)    Viasonix never breached the Agreement and all your claims about a breach or anticipatory breach of agreement are hereby denied and refuted in their entirety.

(ii)   Viasonix never "induced", "encouraged", "instructed" or otherwise influenced any of the CorVascular sales representatives to breach any of their agreements with



KL'AW

קדוש · ושות' · משרד עורכי דין
Kadouch & Co. Law Offices

CorVascular and/or Mr. Lien, nor is or was Viasonix a party to any "scheme" or "coup" to dethrone Mr. Lien or steal the Agreement. The allegations in this respect are pure speculations.

(iii) Viasonix never "threatened" to terminate the Agreement, and certainly not "improperly threatened" to do so. As you very well know, the exclusive distribution right of CorVascular is subject to CorVascular reaching a minimum annual sales quota. It is true that Viasonix notified CorVascular several times that it would consider its options at the end of 2015 if the quota was not met, but in doing so Viasonix was well within its rights.

(iv) Not only that Viasonix did not breach the Agreement, it made consistent efforts to assist CorVascular reach the 2015 quota of 90 Falcon units. This can be easily demonstrated by numerous correspondence showing that, among others, Viasonix sent sales leads to CorVascular (including in the course of Q4 2015 during which Viasonix was allegedly trying to jeopardize CorVascular's chances to reach the 2015 quota!!), Viasonix offered generous discounts on the Falcon units, making it easier for CorVascular to achieve sales (besides refraining of updating the price list as it did in most other countries where prices were increased by approximately 10%), etc. Furthermore, upon CorVascular reaching the 2015 quota Viasonix immediately confirmed this fact in writing, together with an assurance that it intended to continue to adhere to the Agreement.

As you very well know, CorVascular's failure to pay the amounts due to Viasonix constitutes a material breach of the Agreement. I do hope that it is indeed all due to a misunderstanding on the part of your client, in which case this should be solved easily and immediately.

If, on the other hand, your client is determined to drag Viasonix to its disputes and claims with the former CorVascular sales representatives and/or claim for damages that it is not entitled to, you will find that Viasonix is equally determined to defend itself and protect its rights. In any event, any such attempt is bound to end in your client incurring unnecessary expenses to fight a war it cannot win in courts around the globe, as well as having to pay substantial damages to Viasonix, as it has absolutely no case.

We are certainly open to discussion in order to try to resolve the situation in an amicable fashion. However, let it be clear that any such discussion will need to be based on and include the following principles:

(a) Immediate payment of all amounts due to Viasonix as well as a guaranty mechanism to ensure that future payments are made upon their respective due dates.



בתי משרד עורכי דין קדוש ושות'
Kadouch & Co. Law Offices

(b)  Written retraction by CorVascular of any and all claims and allegations against Viasonix and Mr. Manor.

(c)  Written confirmation/agreement by both parties that they intend to honor their obligations pursuant to the Agreement. This should also include a road map for the achievement of the sales quota for 2016 and beyond as well as a clear acknowledgment that in the event that CorVascular shall fail to meet the quota for 2016 for any reason, Viasonix will be free to terminate the Agreement without any reservation and to contract with any person for the sale of the Falcon products in the USA.

(d)  Written confirmation by CorVascular that it does not have any right in connection with the Dolphin product that is currently being developed by Viasonix and that Viasonix is free to distribute the Dolphin product in the USA through any channel or person other than CorVascular, without any reservation.

Assuming that your client is agreeable to an amicable solution, I accept your suggestion to hold a preliminary call between lawyers.

Last, you are hereby advised that if your client declines to discuss based on the foregoing and to make the payments due to Viasonix immediately, Viasonix will consider the Agreement as terminated and weigh its next steps, including taking legal action against CorVascular. Needless to say that Viasonix will also immediately act to identify an alternative distributor for its products in the USA.

Sincerely yours,

Emmanuel Kadouch, Adv.

cc: Mr. Dan Manor, Viasonix

- 3 -

EXHIBIT D

Saar Giron

נושא:                       CorVascular Diagnostics, LLC v. Viasonix, Ltd. et al.

**From:** Tim Fafinski [mailto:timf@greenleafgroup.com]
**Sent:** Wednesday, March 02, 2016 5:55 AM
**To:** Emmanuel Kadouch
**Subject:** CorVascular Diagnostics, LLC v. Viasonix, Ltd. et al.
**Importance:** High

Emmanuel –

I am disappointed that you have not responded to my overture below for a discussion to resolve this matter on a voluntary basis. It is my hope that you reconsider and reach out to discuss an amicable resolution of this matter. I am also disappointed that instead of taking the opportunity to resolve this dispute in a business-like manner, your client has now (i) refused to provide any support in connection with the manufacturer warranties passed through to CorVascular's customers; (ii) continues discussions with CorVascular's former minority members and its other independent representatives to sell the Falcon in direct violation of the exclusivity provision in the Distribution Agreement; and (iii) through its conduits and agents, is intentionally interfering with CorVascular's right to sell its on-hand inventory by spreading falsehoods about CorVascular in an attempt to prevent prospective sales. With respect to the first issue, please be advised that since CorVascular will immediately direct all customer claims, complaints and comments to Viasonix' representatives. It will be Viasonix' responsibility to honor the pass through manufacturer warranties. Since Viasonix has anticipatorily breached the Distribution Agreement, failed to retract its renunciation and has since terminated it, CorVascular is under no obligation to support Viasonix' manufacturer warranties. If your client continues to, directly or indirectly, be involved with the other two (2) issues, it will serve only to increase CorVascular's damage claim.

Thank you.

Timothy W. Fafinski
Attorney At Law
**Corporate Counsel, PA**
(952) 944-9500

**From:** Tim Fafinski [mailto:timf@greenleafgroup.com]
**Sent:** Saturday, February 27, 2016 5:05 PM
**To:** emmanuel@kadouchlaw.com
**Subject:** CorVascular Diagnostics, LLC v. Viasonix, Ltd. et al.
**Importance:** High

Emmanuel –

To follow-up, Viasonix has anticipatorily breached the Distribution Agreement and has failed to retract this anticipatory breach when given an opportunity to do so. Viasonix has refused to discuss a non-monetary basis to resolve this matter. Based on your email below, Viasonix has provided written notice of Viasonix' termination of the Distribution Agreement effective on Friday, February 26, 2016. Please be advised that CorVascular reserves all of its rights and intends to seek all available remedies against Viasonix and the responsible parties for the damages it has and will suffer.

As previously advised, I will communicate an alternative roadmap to a voluntary resolution of this matter in the next few days. I am unavailable the next couple of days --- but my calendar is pretty open on Wednesday and beyond. I am cognizant of the time difference and kindly request that you provide me with your available times.

Thank you.

1

Timothy W. Fafinski
Attorney At Law
*Corporate Counsel, PA*
(952) 944-9500

From: Tim Fafinski [mailto:tlmf@greenleafgroup.com]
Sent: Thursday, February 25, 2016 12:58 PM
To: emmanuel@kadouchlaw.com
Subject: CorVascular Diagnostics, LLC v. Viasonix, Ltd. et al.
Importance: High

Emmanuel ---

Your email is a non-starter and contrary to your espoused plea for "peace rather than open war". I must remind you that it was your client that has anticipatorily breached the Distribution Agreement as set forth in my letter dated February 12, 2016 including, but not limited to, asserting that it had the right to terminate CorVascular's right to the exclusive distribution of the Falcon, its refusal to ship orders to CorVascular, etc. CorVascular gave your client an opportunity to retract this breach and adhere to the terms and conditions of the Distribution Agreement --- yet, your client refused and as such, is in clear breach of the Distribution Agreement. CorVascular is under no legal obligation to further perform when Viasonix continues to refuse to perform its obligations. In fact, it's outright nonsensical and a demonstration of bad faith to demand that Corvascular nevertheless perform and pay Viasonix before Viasonix even discusses whether it will abide by the terms of the Distribution Agreement it voluntarily signed.

I have a few questions regarding the consequences of Viasonix terminating the Distribution Agreement:

(1) CorVascular will initiate a lawsuit against Viasonix in the US for intentional interference with contractual and prospective relations. Your client has been openly encouraging CorVascular's representatives --- who are under contract --- to leave CorVascular if they are not "happy" and have been involved in discussions with CorVascular's reps (and prospective reps) to ensure that CorVascular does not meet the quota. When CorVascular did, in fact, meet quota, your client continued to conjure up non-existent conditions in which he claimed that he could still terminate the agreement and refused to ship product orders. This scheme to pilfer CorVascular's reps under contract to form another distributor who your client, directly or indirectly, controls clearly constitutes tortious conduct and is actionable. Did your client really think it could simply wait for CorVascular to build an organization that sold a record number of Falcons and then just steal its reps who were under contract to start another distribution company that it, directly or indirectly, controlled? Viasonix is not only not going to recover the $130,000, it is exposing itself to a $3M+ lawsuit.

(2) CorVascular holds the rights to exclusively sell the Falcon in the US in 2016 --- it earned that right when it adhered to the terms and conditions of the Distribution Agreement and purchased 90 Falcons in 2015. Any attempt by Viasonix to distribute a single Falcon by any other individual or entity other than CorVascular in the territory --- whether it is a current or former representative of CorVascular --- will be met with immediate legal action, including a request for a temporary restraining order and permanent injunction. In addition, CorVascular will seek to recover the proceeds from any such sale which necessarily includes subpoenaing the customers' records. If a current or former CorVascular representative begins distributing the Dolphin, it will be met with a corporate usurpation claim against the representatives immediately --- which again, will seek recovery of the proceeds and will necessarily include contacting the involved customers. Does your client really believe that after its significant investment, CorVascular is not going to vigorously protect its contractual rights to exclusively distribute the Falcon and simply stand by and let Viasonix distribute it through its reps without seeking damages? Does Viasonix really believe that this won't impact the US market for not only 2016, but quite possibly, all of 2017?

There is no question that unless this matter is resolved immediately, it will significantly impact Viasonix', its distributors, customers, Viasonix' competitors and the marketplace. It is naïve to believe that Viasonix can simply terminate the Distribution Agreement and this matter will simply disappear without significant repurcussions.

2

My client is quite content to move forward with the relationship and build upon last year's record sales or wage a protracted litigation battle to recover the value of the business that was painstakingly nurtured these past few years. It is my long-held belief that every attorney owes a duty to his client to determine if a dispute can be resolved prior to investing considerable resources in protracted litigation. As you know, a judge will force the parties to have this conversation at some point anyway and it might as well be now before the damage in the marketplace is permanent. In a good faith attempt to resolve this matter immediately --- after your client refused to retract its breach ---- my client gave Viasonix a *non-monetary* resolution which included payment of the $130,000, provided certain *non-monetary* conditions (which are largely already in the Distribution Agreement and only required Viasonix' confirmation) were met. Your email below flatly rejected this *non-monetary* solution and demanded $130,000 before Viasonix would agree to discuss honoring its obligation under the Distribution Agreement. Unless Viasonix substantively responds to CorVascular's non-monetary terms by tomorrow, I will assume that the first option to resolve this matter is simply not workable and the parties must part ways. If so, it necessarily follows that the only way to resolve this matter on a voluntary basis will be on *monetary* terms. Again, it is foolhardy to believe that CorVascular is going to build a $3M+ business and permit its supplier and its representatives under contract to bypass it. It is even more foolhardy to believe that such a maneuver would not be met with a legal response and that such response would not impact the US market through 2017.

If you want a "path to peace", I would suggest that Viasonix substantively respond to CorVascular's non-monetary terms by tomorrow at noon US central time.

Thank you.



Timothy W. Fafinski
Attorney At Law
*Corporate Counsel, PA*
(952) 944-9500

**From:** Emmanuel Kadouch [mailto:emmanuel@kadouchlaw.com]
**Sent:** Wednesday, February 24, 2016 9:40 AM
**To:** Tim Fafinski
**Subject:** RE: CorVascular Diagnostics, LLC v. Viasonix, Ltd. et al.

Mr. Fafinski:

In response to your email below, please be advised that my client maintains its position that a discussion towards a resolution of the situation is welcome; however no such discussion will happen for as long as CorVascular holds amounts due to Viasonix in clear and fragrant breach of the Distributor Agreement. Furthermore, my client is not open to negotiation on the terms of the Distributor Agreement. The sole possible discussion would be with a view to ensure the adherence to the Distributor Agreement by both parties without changing its terms, as suggested in my letter from February 22, 2016.
My client is not intimidated by the threats and false claims and allegations detailed in your letters and email and has no intention whatsoever to accept CorVascular's dictations and/or demands.
I further advise you on behalf of Viasonix that, unless the full outstanding amount of $131,290 ($71,580 plus $59,710 that were due on February 16 and 22, 2016, respectively) is received in Viasonix' bank account not later than Friday, February 26, 2016 at noon Israel time, the Distributor Agreement shall forthwith terminate. I am sure that you are fully aware of the consequences of such termination.
I do hope that your client will choose the path of peace rather than an open war.

Yours Sincerely,

Emmanuel Kadouch

3



Emmanuel Kadouch - emmanuel@kadouchlaw.com
8b Abba Eban Blvd.- P.O.B 12695 - Herzliya 4673300- Israel
Tel: +972-9-9525454 - Fax: +972-9-9525450 – Mob: +972-54-4699915

**From:** Tim Faflnskl [mailto:timf@greenleafgroup.com]
**Sent:** 23 February, 2016 19:02
**To:** Emmanuel Kadouch
**Subject:** CorVascular Diagnostics, LLC v. Viasonix, Ltd. et al.
**Importance:** High

Emmanuel ---

Thank you for your letter dated February 22, 2016 in connection with the above-entitled matter. Please understand that my client has maintained an exhaustive and detailed log of your client's activities over the past eight (8) months that substantiate its position that Viasonix clearly supported and encouraged CorVascular's minority owners and independent representatives to breach not only their contracts, but also their fiduciary duties to CorVascular. Time and time again, Mr. Manor volunteered his unsolicited opinion that unless Mr. Lien capitulated to every demand of the minority members, he would terminate the Distribution Agreement for a myriad of reasons --- i.e., not meeting quota (before the time for quota had even lapsed), management changes, number of reps, etc. In fact, when Mr. Lien and the minority owners were negotiating a potential buy-out, they agreed and signed an agreement that all discussions and terms were to be held in the strictest confidence and not to be disclosed to any third party. Shortly thereafter when the CorVacular owners were at an impasse, Mr. Manor called Mr. Lien, advised that he was aware of the terms (in direct violation of the confidentiality agreement) and actually began negotiating on behalf of the minority owners. He even went on to warn Mr. Lien that there were certain terms he would not "allow" or approve as if he had such authority.

At any rate, for the reasons set forth in my previous letter, the purported basis for Mr. Manor's incessant threats were without legal merit. These unfounded threats communicated to CorVascular's independent representatives had the devastating effect of emboldening them to refuse to perform their responsibilities and worse yet, advising other prospective reps that CorVascular will lose exclusivity necessarily resulting in preventing CorVascular from attracting quality reps. There is no question that Mr. Manor has engaged in communications with CorVascular's minority owners on several instances where the discussion focused on removing Mr. Lien. For instance, one of CorVascular's minority owners expressly told Mr. Lien that, in one of their several conferences where Mr. Lien was not invited, Mr. Manor proclaimed that Mr. Lien "has to go". These discussions with CorVascular's minority shareholders also focused on entering into a contractual relationship that included the minority owners breaching their independent rep agreements and their duties owed to CorVascular. Your client knew of these contractual relations, was warned to stop interfering and yet, still moved forward. I am quite confident that my client's voluminous log of Viasonix' activities will only be augmented during litigation once all of the individuals (both the minority owners and prospective independent reps) have had their depositions taken and copies of their emails, texts, etc. produced. Quite simply, your client overstepped its authority and crossed the line into outright interference and meddling. These repeated instances of interfering with CorVascular's contractual relations has had a devastatingly negative impact on this $3M+ business.

It is evident that neither party will be able to convince the other of the respective merits of their legal position. Although the parties may have differing opinions over these events, there is no requirement that they agree in order to move forward with a solution. It must be pointed out that despite this alarming level of interference and in-fighting, CorVascular still was able to increase sales by a significant margin from the previous years' production. I see two (2) possible ways of resolving this matter without the costs and unpleasantness associated with protracted litigation. The first option as it relates to Viasonix is non-monetary and is as follows:

  ○ Viasonix unconditionally agrees in writing that CorVascular holds the exclusive rights to sell the Falcon product line in the defined territory in 2016, provided that it adheres to the terms and conditions of the

4

Distribution Agreement. This should be easy for your client since there is no reasonable dispute that CorVascular already has the right to distribute the product on an exclusive basis. Viasonix shall agree to reasonably cooperate with CorVascular in attracting prospective independent sales representatives to distribute its products. Viasonix will waive any right to assert that it can terminate the Distribution Agreement for reasons of change in management, ownership or not having sufficient number of independent sales representatives. It is fundamentally unfair for Viasonix to assert that it can terminate the Distributor Agreement for these reasons when Viasonix' overt activities or at a minimum, its tacit approval and encouragement, caused these changes or prevented their completion. If the terms of this first option are met, Mr. Lien would be pleased to meet with Mr. Manor and discuss his road map for 2016 and beyond.

- ° Viasonix must refrain from discussing the status of the Distribution Agreement with any independent sales representative or third party other than confirming and acknowledging that CorVascular holds the exclusive rights to sell the product in 2016. Viasonix must further refrain from becoming involved with any issue that involves CorVascular's operations, its management of its business or who it selects to be an independent representative or their training or qualifications. The Distribution Agreement clearly delineates each parties rights and obligations --- none of which includes demanding certain employees or contractors be involved or are kept "happy" or "positive". Both parties should manage their own business and not interfere or offer opinions to the other.

- ° Viasonix shall immediately deliver the 3 Quads and provide a schedule for all other pending product orders and continue to deliver product in a timely manner consistent with the parties' prior course of dealing. Upon confirmation that these orders are in route, CorVascular shall immediately pay the monies currently due and owing and continue to do so.

- ° Since CorVascular is now forced to rebuild its sales staff as a result of Viasonix and the minority owners' activities and a portion of 2016 has already passed dealing with these issues, the 2016 quota shall be 70 units. The 2017 quota shall return to 90 units.

- ° CorVascular is not interested in repeating the past eight (8) months and having to deal with the threat that current or former representatives will compete directly against it with your client's encouragement. Any resolution must include Viasonix' agreement not to solicit, employ or otherwise contract with any current or former CorVascular independent representative, member or employee in connection with the distribution, marketing, manufacture or sale of any Viasonix or affiliate's current or future product offering (including the Dolphin) without its advance written approval for a period of 24 months from the last day CorVascular is able to sell and distribute the Falcon product line. Since your client denies that it entered into discussions or reached an arrangement with any of CorVascular's representatives to distribute Viasonix' product outside of CorVascular, this non-monetary condition should presumably not be an obstacle for Viasonix.

- ° CorVascular will acknowledge that Viasonix is under no obligation to grant CorVascular the right to distribute the Dolphin product and is free to enter into an arrangement to distribute the Dolphin product through any channel or person of its choosing save and except with any current or former CorVascular representative or owner for the applicable 24 month time period.

As you see, these non-monetary conditions are very close to your demands and ensures a seamless and prompt resolution. Alternatively, if these conditions are not acceptable, it must be said that it would serve only to substantiate CorVascular's position that Viasonix and the minority owners had already reached an arrangement to bypass CorVascular. If that is the case, then the second option involves Viasonix and the minority owners buying Mr. Lien's interests. If the first option is unacceptable, then I will provide you details regarding the monetary second option. Of course, the third option is that the parties litigate the various claims at significant cost and exposure.

Given the fact that your client is not currently shipping product for CorVascular's customers, it is imperative that the parties resolve this matter promptly before CorVascular's competitors fill in the gap. Please feel free to contact me at (952) 944-9500 to further discuss this matter.

5

Timothy W. Faflnski
Attorney At Law
*Corporate Counsel, PA*
Direct: (952) 944-9500
Fax:     (952) 516-5800
Email:   timf@greenleafgroup.com

** This is a transmission from the law firm of Corporate Counsel, PA and may contain information which is privileged, confidential, and protected by the attorney-client or attorney work product privileges. If you are not the addressee, note any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this transmission in error, please destroy it and notify us immediately at our telephone number (952) 944-9500.

EXHIBIT E

Saar Giron

**נושא:** FW: Settlement Discussion Subject to Rule 408 --- CorVascular Diagnostics, LLC v. Talcott et al.

**From:** Emmanuel Kadouch
**Sent:** 07 March, 2016 21:29
**To:** 'Tim Fafinski'; Chiles, Leigh; ssitek@bassford.com
**Subject:** RE: Settlement Discussion Subject to Rule 408 --- CorVascular Diagnostics, LLC v. Talcott et al.

Dear Mr. Fafinski,

Mr. Fafinski,

I confirm receipt of your detailed analysis and proposal. We will give it some consideration. Since Mr. Manor is away on vacation, I believe that we will be able to get back to you on this by the middle of next week.

In the meantime, since Viasonix terminated the Distributor Agreement as of Friday, February 26, 2016 per my email to you dated February 24, 2016, your client is hereby requested to remove from its website any reference and/or mention of CorVascular being a distributor of the Falcon or a business partner of Viasonix. Further, CorVascular is hereby requested to ship back the four loaner Falcon systems received from Viasonix to support the sales and services of the Falcons or to make an immediate $30,000 payment therefor.
In addition, for the avoidance of doubt, CorVascular is hereby notified that it may not sell any of the Falcon units that CorVascular received and failed to pay to Viasonix in breach of the Distributor Agreement.

For the record, despite your allegations, Viasonix never refused to provide support as claimed in your email dated March 2, 2016. This is another allegation clearly intended to show Viasonix in a negative light. Let me also remind you that the "Service Responsibility" clause in the Distributor Agreement sets forth that "*CVDx will continue to provide service to the products sold by it also after the termination of this Agreement for the duration of the original warranty provided by Viasonix...*". Failure to do so will entitle Viasonix to take action against your client.

Sincerely yours,

Emmanuel Kadouch


KLAW
קדוש ושות' משרד עורכי דין
Kadouch & Co. Law Offices

Emmanuel Kadouch - emmanuel@kadouchlaw.com
8b Abba Eban Blvd.- P.O.B 12695 - Herzliya 4673300- Israel
Tel: +972-9-9525454 - Fax: +972-9-9525450 – Mob: +972-54-4699915

EXHIBIT F



TIMOTHY W. FAFINSKI
3411 Brei Kessel Road, Independence, MN 55359
Tel.: (952)944-9500   Fax: (952)516-5800
E-Mail: timf@greenleafgroup.com

June 17, 2016

Mr. John Haefele
*Unetixs Vascular*
125 Commerce Park Road
North Kingstown RI 02852

RE:     CorVascular Diagnostics, LLC/Viasonix, Ltd.

Dear Mr. Haefele:

Please be advised that the undersigned represents CorVascular Diagnostics, LLC ("CorVascular"). It has been brought to my attention that you, or at your directive, others, have been an active participant in conduct that has significantly damaged my client. This conduct includes (i) uttering false and misleading representations regarding CorVascular to CorVascular's customers, potential customers, and suppliers; (ii) participating in a scheme with certain CorVascular representatives to interfere with CorVascular's contractual relations with its suppliers, other sales representatives and customers; (iii) improperly securing and utilizing CorVascular's confidential and proprietary information; and (iv) unlawfully utilizing this information to convert sales from CorVascular. These acts constitute actionable tortious conduct. This letter serves as formal demand to refrain from all such further activities. CorVascular specifically reserves all of its rights and claims from any improper conduct that occurred prior to the date of this letter.

Please be further advised that CorVascular's remains the exclusive distributor of the Falcon in the United States and intends to vigorously pursue any and all claims against any person or entity who sells, attempts to sell, refers or otherwise participates in the sale of the Falcon by or through any other person or entity other than CorVascular in the United States.

Please govern yourself accordingly.

Very truly yours,

Timothy W. Fafinski
Attorney At Law